**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**JUNE E. BULES**
Plymouth, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

FILED

Apr 17 2012, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOHN BROOKE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 75A05-1106-CR-297 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE STARKE CIRCUIT COURT
The Honorable Kim Hall, Judge
Cause No. 75C01-1002-FC-6

**April 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

John Brooke and his girlfriend harbored a wanted fugitive in their home and learned that the authorities were on his trail. The trio and one of Brooke's friends concocted a plan to use homemade explosives and Brooke's firearms against any authorities who came to arrest the fugitive, after which they would simultaneously rob two banks and flee to Canada. Brooke was at work when his friend notified him that police officers had arrived to arrest the fugitive. Brooke left work and parked his truck a block away from his home. Equipped with a reinforced bulletproof vest, a handgun, and a semiautomatic assault rifle, he advanced toward one of the officers stationed near his home. Another officer saw Brooke approaching and ordered him to drop his rifle. Brooke did not comply, so the officers tackled and disarmed him, cuffed his hands behind his back, and placed him in a police car.

The fugitive inside Brooke's home fired at the officers with an automatic rifle, and the officers returned fire. During the melee, Brooke managed to get his hands in front of him, escaped from the police car, and ran into his backyard. He returned with one of his dogs in his arms and asked the officers not to shoot. An officer took the dog and again placed Brooke in custody. The standoff ended after a SWAT team flushed the fugitive from Brooke's home with tear gas. Inside the home, police found over a dozen Molotov cocktails, numerous firearms and ammunition, a pipe bomb attached to a propane tank, and a notepad with plans for the breakout and bank robberies.

The State charged Brooke with conspiracy to commit armed robbery, intimidation, possession/manufacturing of a destructive device (a Molotov cocktail), possession of a

destructive device (a pipe bomb), resisting law enforcement, unlawful use of body armor, and assisting a criminal. A jury found him guilty on all counts except the count relating to the pipe bomb. The trial court sentenced Brooke to twenty-two years of imprisonment. On appeal, Brooke challenges his conspiracy conviction and his sentence. We affirm.

**Facts and Procedural History**

The facts most favorable to the jury's verdict are that around the beginning of February 2010, Michael Drogosz called Brooke, a childhood friend, and asked for a place to stay. Brooke drove to Chicago to pick up Drogosz, and they returned to the home that Brooke shared with his girlfriend Kimberly Hitchens in Knox, Indiana. Drogosz stayed with Brooke and Hitchens for a couple weeks. At some point, Brooke learned that Drogosz was wanted on an Illinois burglary warrant and that law enforcement authorities were closing in.

During the Valentine's Day weekend, Drogosz, Brooke, Hitchens, and James Reed, another friend who was staying with Brooke, devised a plan to escape if police officers came to arrest Drogosz. Brooke and Drogosz wrote and sketched out parts of the plan on a notepad. Brooke was a gun enthusiast and had numerous firearms and thousands of rounds of ammunition in his home, as well as some bulletproof vests that had been reinforced with steel plates. If Brooke was away from the house when the officers arrived, Reed would send him a "911" text, and he would park his truck at the end of the street and shoot the officers with a sniper rifle. Homemade Molotov cocktails would also be used to repel the officers. After the foursome escaped, they would simultaneously rob two local banks at gunpoint and use the money to flee to Canada. At Brooke's request, Hitchens and Reed purchased some

3

diesel fuel and dish soap to make the Molotov cocktails, as well as two propane tanks and a first-aid kit. Brooke and Reed made over a dozen Molotov cocktails using diesel fuel, dish soap, and canning jars.[1] A pipe bomb and some screws and bolts were taped to one of the propane tanks.

On Monday, February 15, 2010, the Starke County Sheriff's Department received a request from Illinois authorities to arrest Drogosz on the outstanding warrant. The department had received a tip that Drogosz was staying at Brooke's house, so Deputies Don Ferguson and Bill Dulin went there to arrest him. Brooke was at work, and Hitchens was inside the house with Drogosz and Reed. Deputy Ferguson knocked on the front door, and Deputy Dulin went to the back of the house. Hitchens answered the door and initially denied that Drogosz was there, but eventually she admitted that he was and that there were weapons inside the house. Deputy Ferguson escorted Hitchens to his police car and called for backup. Reed sent Brooke the "911" text and called to let him know that the police had arrived.

Detective Kenny Pfost, Deputy Todd Keen, and Sergeant Fred Baker responded to Deputy Ferguson's request for backup. Deputy Ferguson used a loudspeaker to ask Drogosz

---

[1] According to ATF agent Katherine Newby,

> The functioning of a Molotov cocktail is that you light the wick, throw it. The Molotov cocktail is necessarily in a frangible container, so you throw it against a hard object, such as a brick wall, concrete wall, something like that. It breaks the container. It spreads the flammable liquid. And you have lit the wick prior to throwing of it [sic], and it ignites all of the flammable liquid. A thickener [such as dish soap] would make it stick to whatever surface you were trying to get started on fire.

Tr. at 434.

to surrender. Reed walked out the front door and was taken into custody. Deputy Ferguson then telephoned Drogosz and attempted to negotiate his surrender.

Meanwhile, Brooke drove into his neighborhood and saw several police vehicles parked near his home. He parked his truck a block away and donned a reinforced bulletproof vest. He then armed himself with a loaded .50 caliber handgun, a loaded semiautomatic assault rifle (with two magazines taped together military-style to facilitate rapid reloading), and extra ammunition and walked through a wooded area toward his home.

During a break in the negotiations, Deputy Ferguson saw Brooke approach Sergeant Baker, who was stationed behind one of the police vehicles. Deputy Ferguson alerted Sergeant Baker, and both men ordered Brooke to drop his rifle and hit the ground. Brooke did not comply and told the officers that they "needed to get the f**k off of his property." Tr. at 59.[2] Sergeant Baker knocked the rifle out of Brooke's hands and struggled to subdue Brooke, who kept reaching inside his jacket pocket. Detective Pfost cuffed Brooke's hands behind his back and reached into his pocket, where he found the handgun. Brooke was taken into custody and placed in a police car.

---

[2] In preparing the transcript and exhibits, the court reporter disregarded several important requirements of the Indiana Rules of Appellate Procedure. Appellate Rule 28(A)(7) provides that the title page of each transcript volume "shall conform to Form #App.R.28-1," which requires that each title page specify both the number of that volume and the total number of volumes (for example, "Volume 1 of 8"), as well as which pages that volume contains (for example, "Pages 1 through 250"). All the title pages of the eight-volume transcript in this case list the page numbers contained in all the volumes, but none of them specify the number of that particular volume. Also, the transcript's table of contents is not in a separately bound volume as required by Appellate Rule 28(A)(8). And finally, the exhibits were not bound as required by Appellate Rule 29(A). These rule violations needlessly complicated our review of Brooke's appeal. We remind the court reporter that any provision of the Appellate Rules "regarding preparation of the Record on Appeal may be enforced by order of the Court on Appeal" pursuant to Appellate Rule 27 and that we will not hesitate to issue such orders in response to future rule violations.

When the negotiations resumed, Drogosz told Deputy Ferguson that he wanted to speak with Brooke. Deputy Ferguson replied that he could not do so because Brooke was in custody. Drogosz said that he "would think about coming out" and hung up the phone. *Id.* at 63. A gunshot rang out. Deputy Ferguson and Detective Pfost initially thought that Drogosz might have shot himself, but moments later Drogosz fired dozens of shots from a .308 caliber semiautomatic rifle that had been illegally converted to a fully automatic weapon. Bullets struck two police cars, narrowly missing Deputy Dulin's shoulder and kicking snow into Deputy Ferguson's face. The officers provided covering fire for each other so they could withdraw to safer positions farther from the house.

During the firefight, Brooke managed to get his hands in front of him and escaped from the police car. He ran to the backyard, grabbed one of his dogs, and ran toward Deputy Keen, asking him not to shoot. Deputy Keen took the dog and placed Brooke in a police car. Eventually a SWAT team arrived and flushed Drogosz from the house with tear gas. Inside Brooke's home, police found five handguns, four shotguns (including an illegal sawed-off shotgun), three rifles, thousands of rounds of ammunition, three bulletproof vests, fourteen Molotov cocktails, and the pipe bomb taped to the propane tank.[3]

The State charged Brooke with seven counts: class B felony conspiracy to commit armed robbery; class C felony intimidation; class C felony possession/manufacturing of a destructive device (a Molotov cocktail); class C felony possession of a destructive device (a

---

[3] According to ATF agent Newby, if the pipe bomb had been detonated, there was "a large possibility of the explosive igniting the propane and causing a large fireball," and the screws and bolts taped to the tank would have had an "anti-personnel shrapnel effect." Tr. at 430.

pipe bomb); class D felony resisting law enforcement; class D felony unlawful use of body armor; and class D felony assisting a criminal. In April 2011, a jury found him guilty on all counts except the count relating to the pipe bomb. The trial court sentenced Brooke to twenty-two years of imprisonment. This appeal ensued.

**Discussion and Decision**

### I. Conspiracy Conviction

Brooke frames his first argument as whether the State presented sufficient evidence to convict him of conspiracy to commit armed robbery.[4] To convict Brooke of that crime, the State had to prove beyond a reasonable doubt that Brooke, with the intent to commit armed robbery, agreed with another person to commit that felony and that either Brooke or his co-conspirator(s) performed an overt act in furtherance of the agreement. *See* Ind. Code § 35-41-5-2 (defining conspiracy). The State charged Brooke as follows:

> With intent to commit a felony, to wit: Armed Robbery, John Brooke did agree with Michael Drogosz, James Reed and/or Kimberly Hitchens to commit the felony of Armed Robbery, which is to knowingly or intentionally take property from another person or from the presence of another person by using or threatening the use of force on any person, or by putting any person in fear, while armed with a deadly weapon; and John Brooke, Michael Drogosz, James Reed, or Kimberly Hitchens did perform an overt act in furtherance of the agreement, to wit:
>
> • discussed having a shootout with the police should police come to [Brooke's house];

---

[4] Robbery is the knowing or intentional taking of property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear. Ind. Code § 35-42-5-1. Robbery is a class B felony if it is committed while armed with a deadly weapon. *Id*. "A conspiracy to commit a felony is a felony of the same class as the underlying felony." Ind. Code § 35-41-5-2(a).

7

- planned to have James Reed notify John Brooke via phone when police arrived, in the event Brooke was not home at the time;

- planned to have Kimberly Hitchens keep the officer(s) occupied when officers first arrived;

- planned to escape from the area and rob banks in Knox using firearms;

- wrote down portions of the plan and the supplies needed in execution of the plan;

- James Reed called John Brooke when police arrived at the house; and,

- Michael Drogosz used a firearm to shoot at police after police arrived at the house[.]

Appellant's App. at 15.

Brooke does not specifically argue that the State failed to prove beyond a reasonable doubt that he and his colleagues intended and agreed to commit armed robbery or that they performed the acts as alleged in the charging information. Rather, his argument seems to be that those acts were performed in furtherance of "having a shootout with the police not robbing a bank." Appellant's Br. at 11. Brooke's argument is perhaps marginally persuasive with respect to some of the alleged acts, but not with respect to the acts of "plan[ning] to … rob banks in Knox using firearms," "wr[iting] down portions of the plan and the supplies needed in execution of the plan," and purchasing supplies (such as the first-aid kit) "that might be used in the execution of the plan." Appellant's App. at 15. Again, Brooke does not contend that the State failed to prove beyond a reasonable that those acts were committed,

nor does he contend that those acts are insufficiently "overt" for purposes of the conspiracy statute.[5]  Consequently, we affirm his conspiracy conviction.

## II. Sentencing

Brooke asserts that his sentence is inappropriate pursuant to Indiana Appellate Rule 7(B), which says, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  In advancing this assertion, Brooke first discusses the nature of his offenses and his character and then challenges the trial court's consideration of aggravating and mitigating circumstances.  The State correctly observes that Brooke "conflates two separate sentencing standards:  whether the trial court abused its discretion in identifying aggravating and mitigating factors, and whether the aggregate sentence is inappropriate."  Appellee's Br. at 16-17; *see King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008) ("As our Supreme Court has made clear, inappropriate sentence and abuse of discretion claims are to be analyzed separately.") (citing *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218). We address each claim separately.

---

[5] Such a contention would be meritless.  *See Dickenson v. State*, 835 N.E.2d 542, 552-53 (Ind. Ct. App. 2005) (holding that defendant's act of "'helping prepare a letter concerning the details of [an] agreement'" to commit murder was sufficiently overt to sustain conspiracy conviction), *trans. denied*; *see also Owens v. State*, 929 N.E.2d 754, 756-57 (Ind. 2010) ("A conspiracy is complete upon the agreement and the performance of an overt act in furtherance of the agreement.  The overt act need not rise to the level of a 'substantial step' required for an attempt to commit the felony.  A defendant may therefore be convicted of a conspiracy to commit a felony without committing the felony and without even an attempt to commit it.") (citations and quotation marks omitted).

### A. Aggravating and Mitigating Circumstances

In *Amalfitano v. State*, we said that

> [s]entencing decisions rest within the sound discretion of the trial court and are reviewed only for abuse of discretion. To provide for meaningful appellate review, trial courts are required to enter reasonably detailed sentencing statements when imposing a sentence for a felony. A trial court may abuse its discretion when issuing a sentencing statement if: 1) it does not enter a sentencing statement at all, 2) the statement explains reasons for imposing a sentence but those reasons are not supported in the record, 3) the statement omits reasons clearly supported by the record that were advanced for consideration, or 4) reasons given in a statement are improper as a matter of law. If a sentencing order lists aggravating and mitigating circumstances, the order must identify all such circumstances and explain why each has been determined to be aggravating or mitigating.

956 N.E.2d 208, 211 (Ind. Ct. App. 2011) (citations omitted), *trans. denied* (2012).

"A single aggravating circumstance may be enough to justify both the enhancement of a sentence and the imposition of consecutive sentences." *Barber v. State*, 863 N.E.2d 1199, 1208 (Ind. Ct. App. 2007), *trans. denied*. The relative weight or value assignable to properly found reasons for imposing a sentence is not subject to review for abuse of discretion. *Heyen v. State*, 936 N.E.2d 294, 304 (Ind. Ct. App. 2010), *trans. denied* (2011). "We may review both the oral and written statements in order to identify the findings of the trial court." *Id.*

### 1. Aggravating Circumstances

Brooke first asserts that the trial court abused its discretion in finding as an aggravating circumstance that "the harm, injury, loss or damage suffered by the victims of [his] crimes were significant and greater than the elements necessary to prove the

10

commission of the offense[s]." Appellant's App. at 33.[6] In support of this determination, the

trial court made the following additional findings in its written sentencing statement:

(A)    While only one act in furtherance of the conspiracy is needed for a conviction, this Defendant engaged in many, including directing co-conspirators to obtain the ingredients for explosives and then personally manufacturing the explosives to be used during the robbery, all of which occurred in a residential neighborhood.

(B)    To commit the crime of Conspiracy to Commit Robbery, a person does not need to agree to kill police officers, but this Defendant did so.

(C)    While it is not necessary to provide a firearm to a fugitive from justice in order to be convicted of Assisting a Criminal, this Defendant provided the fugitive sanctuary in the Defendant's home and access to numerous high-powered weapons, ammunition, bullet-proof vests, and explosives, knowing that the police were likely to attempt to arrest the fugitive, and the fugitive had stated that he would not go back to prison. The logical inference was that the fugitive would use the weapons to resist any effort by police to take him into custody.

(D)    While it is not necessary that a fugitive from justice engage in violence when police attempt to execute an arrest warrant in order for the Defendant to be convicted of Assisting a Criminal, the fugitive from justice in this case used the Defendant's home for protection while he fired more than fifty, (50), rounds, with the specific intent of killing police officers. (The fugitive pled guilty to two, (2), Counts of Attempted Murder and Conspiracy to Commit Armed Robbery, and by agreement, was sentenced to serve seventy, (70), years in the Indiana Department of Correction[]). The bullets narrowly missed two, (2), officers who were pinned down behind their squad cars for cover. Photographic evidence and the testimony of Officer Bill Dulin established that one, (1), bullet came within a few inches of striking the officer in the back. The officers, who thought that they were going to die, will likely remember that traumatic experience the rest of their lives. That harm is significant, and greater than the elements necessary to prove the commission of the offenses.

_____

[6] *See* Ind. Code § 35-38-1-7.1(a) ("In determining what sentence to impose for a crime, the court may consider the following aggravating circumstances: (1) The harm, injury, loss, or damage suffered by the victim of an offense was: (A) significant; and (B) greater than the elements necessary to prove the commission of the offense.").

*Id*. at 33-34.

Regarding paragraph (A), Brooke contends that "[n]othing in the evidence supports that explosives were to be used during the robbery." Appellant's Br. at 15. Brooke told investigators that the Molotov cocktails were going to be used "[f]or repelling the officers," Tr. at 530, and we think that it was perfectly reasonable for the trial court to infer that they could have been used not only during a standoff at Brooke's home but also during the bank robberies. As for paragraph (B), Brooke says that he "planned/agreed to shoot police officers, but he chose not to follow through with the plan. He did not fire a shot at anyone." Appellant's Br. at 15. This argument misapprehends the nature of a conspiracy charge, which focuses on the agreement to commit a offense and not the actual commission of an offense. Concerning paragraph (C), Brooke asserts that he "did not provide [the firearms and other items] to Drogosz. Drogosz took it upon himself to use the weapons and shoot at the police." *Id*. Brooke's attempt to evade responsibility for Drogosz's violent actions did not convince the trial court, nor does it convince us. And finally, regarding paragraph (D), Brooke points out that "the police officers involved did not even make any type of statement at all during the sentencing hearing." *Id*. True enough, but an obviously emotional Deputy Ferguson testified at trial that he thought that he "wasn't going to see [his] wife again" after Drogosz opened fire with the automatic rifle, Tr. at 67, and Deputy Ferguson testified that a bullet "came through about four or five inches away from [his] right shoulder." *Id*. at 86. This testimony is more than sufficient to support the trial court's determination that the experience was "traumatic" for the officers.

More generally, Brooke asserts that "[n]one of the reasons the trial court states in support [of] this aggravating factor actually shows any harm, injury, loss or damage to the victims." Appellant's Br. at 15. Although it is true that no one was physically harmed, Brooke's plan to kill police officers and rob two banks with the assistance of a wanted fugitive was exceedingly reckless and violent and resulted in an armed confrontation and a shootout that traumatized the officers involved and riddled two of their cars with bullets. We cannot say that the trial court abused its discretion in finding the nature of Brooke's crimes to be an aggravating circumstance.

The trial court also found as an aggravating circumstance that Brooke was "a leader in the conspiracy involving four, (4), people, to kill police, rob banks with automatic weapons, bullet-proof vests, and explosives, and then flee the county [sic]." Appellant's App. at 34. Brooke complains that "[i]f any one person was the leader in this it was Drogosz. He was the one that said he would not go back to jail. He wanted to have a shoot out with police." Appellant's Br. at 15. The State correctly observes that the trial court "did not find that Brooke was the only leader of the conspiracy, rather that he was *a* leader – consistent both with Drogosz's key role in the crimes and the lesser culpability of Hitchens and Reed." Appellee's Br. at 18. We find no abuse of discretion here, either.

The trial court found as a third aggravating circumstance that he made false statements during the police investigation of the shootout. Brooke contends that his false statements "do not justify both an enhanced and consecutive sentence." Appellant's Br. at 15. Brooke's

argument is a request to reweigh this aggravator, which we may not do. *Heyen*, 936 N.E.2d at 304.

As the fourth and final aggravating circumstance, the trial court found that Brooke's

distorted view of the world and his strong anti-law enforcement attitude, combined with his long-held, all-consuming obsession with firearms and explosives, make him a dangerous individual. The evidence in the trial included the following:

(A)    The Defendant spent the night of the Millen[n]ium in the woods with his rifle, to shoot individuals during the anarchy that would occur after midnight.

(B)    The Defendant allegedly dropped out of high school because of the "Columbine shootings."

(C)    The Defendant told investigators from the ATF that, "If America is ever invaded, I'm the man."

The Defendant has an anti-social attitude and anti-social personality which are major risk factors for recidivism.

Appellant's App. at 35-36. Brooke claims that "[n]othing in the record would support that his beliefs have caused him to ever be violent toward others or a danger to others." Appellant's Br. at 14. The incidents that led to Brooke's arrest convincingly demonstrate otherwise. We find no abuse of discretion here.

### 2. *Mitigating Circumstances*

The trial court found three mitigating factors: (1) that Brooke "led a law-abiding life for a substantial period before the commission of the crime[s]"; (2) that he "did not commit perjury," unlike Hitchens and Reed; and (3) that he "has the support of his family members." Appellant's App. at 36. Brooke contends that the court erroneously "failed to consider and

14

weigh" several additional mitigating circumstances. Appellant's Br. at 16. Brooke failed to raise these mitigators at the sentencing hearing and therefore has waived their consideration on appeal. *See Sargent v. State*, 875 N.E.2d 762, 770 (Ind. Ct. App. 2007) ("If the defendant fails to advance a mitigating circumstance at sentencing, this court will presume that the circumstance is not significant and the defendant is precluded from advancing it as a mitigating circumstance for the first time on appeal."). Brooke also argues that "the mitigating circumstances outweigh any aggravating circumstances," Appellant's Br. at 16, but such claims are not reviewable on appeal. *See Powell v. State*, 895 N.E.2d 1259, 1262 (Ind. Ct. App. 2008) ("Because the trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, a trial court cannot now be said to have abused its discretion in failing to properly weigh such factors."), *trans. denied* (2009).

## B. Appropriateness of Sentence

We have said that the principal role of Appellate Rule 7(B) review

should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived "correct" result in each case. We should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count. Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.

*Coleman v. State*, 952 N.E.2d 377, 384 (Ind. Ct. App. 2011) (citations and quotation marks omitted). "Although Rule 7(B) does not require us to be 'extremely' deferential to a trial court's sentencing decision, we still must give due consideration to that decision. We also

15

understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Id*. at 383 (citation omitted). Brooke bears the burden of persuading us that his sentence is inappropriate. *Id*. at 384.

### 1. Nature of the Offense

"Regarding the nature of the offense, the advisory sentence is the starting point our legislature has selected as an appropriate sentence for the crime committed." *Richardson v. State*, 906 N.E.2d 241, 247 (Ind. Ct. App. 2009). The sentencing range for a class B felony is between six and twenty years, with an advisory sentence of ten years. Ind. Code § 35-50-2-5. The sentencing range for a class C felony is between two and eight years, with an advisory sentence of four years. Ind. Code § 35-50-2-6. And the sentencing range for a class D felony is between six months and three years, with an advisory sentence of one and one-half years. Ind. Code § 35-50-2-7. Here, the trial court imposed concurrent executed sentences of fifteen years for class B felony conspiracy to commit armed robbery and four years for class C felony possession/manufacturing of a destructive device; concurrent executed sentences of four years for class C felony intimidation, one year for class D felony resisting law enforcement, and one year for class D felony unlawful use of body armor, to be served consecutive to the foregoing counts; and a three-year executed sentence for class D felony assisting a criminal, to be served consecutive to the foregoing counts, for a total sentence of twenty-two years of imprisonment.

Brooke's conspiracy entailed killing police officers and robbing two banks. He furnished a wanted fugitive with numerous firearms, incendiary and explosive devices, and a

bulletproof vest, and he himself advanced toward unsuspecting police officers with an assault rifle and a handgun and a bulletproof vest. Brooke self-servingly claims that "[h]e made a conscious decision to not fire a shot that day." Appellant's Br. at 13. He neglects to mention, however, that he disobeyed the officers' commands to drop his rifle, engaged in a physical struggle with Sergeant Baker and Detective Pfost, and reached for the pocket that held his .50 caliber handgun. Deputy Ferguson believed that Brooke "was actually going to try to kill" Sergeant Baker and Detective Pfost. Tr. at 61. Drogosz fired dozens of shots at the officers with Brooke's illegal automatic rifle and had to be ousted from Brooke's home with tear gas. Incredibly, no one was killed or wounded during the armed standoff at Brooke's home, but the reckless and violent nature of his crimes clearly justifies a lengthy sentence.

### 2. *Character of the Offender*

Brooke was born in October 1986, had no previous juvenile or criminal history, and was gainfully employed. Nevertheless, he demonstrated extremely poor judgment and a callous disregard for societal norms and human life by harboring a wanted fugitive and conspiring with him to kill police officers and rob banks. Brooke could have turned Drogosz over to the authorities, or at least not interfered with their attempt to arrest him. Instead, fully armed and armored, he confronted the officers and reached toward his handgun while they struggled to handcuff him. After he was arrested, he gave false statements to investigators. Brooke has failed to persuade us that his antisocial character warrants a reduction of his sentence. Therefore, we affirm.

Affirmed.

VAIDIK, J., and BRADFORD, J., concur.